# In the United States Court of Federal Claims

No. 18-76C

(Filed: April 25, 2018)*

**\*Opinion Originally Filed Under Seal on April 17, 2018**

| | | |
|---|---|---|
| KIEWIT INFRASTRUCTURE WEST CO., | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Post-Award Bid Protest; Best-Value Tradeoff Analysis; Technical Evaluation |
| THE UNITED STATES, | ) ) | |
| Defendant, | ) ) | |
| FLATIRON｜DRAGADOS｜SUKUT JOINT VENTURE, | ) ) ) | |
| Defendant-Intervenor. | ) ) | |

*Douglas L. Patin*, Washington, D.C., for plaintiff.  *Aron C. Beezley* and *Lisa A. Markman*, Washington, D.C., of counsel.

*James W. Poirier*, Civil Division, U.S. Department of Justice, Washington, D.C., with whom were *Chad A. Readler*, Acting Assistant Attorney General, *Robert E. Kirschman, Jr.*, Director, and *Steven J. Gillingham*, Assistant Director, for defendant.  *Amanda R. Fuller*, Deputy District Counsel, U.S. Army Corps of Engineers, Sacramento, CA, of counsel.

*Joseph G. Martinez*, Denver, CO, for defendant-intervenor.  *K. Tyler Thomas* and *Tess E. Gosda*, Denver, CO, of counsel.

# O P I N I O N

**FIRESTONE**, Senior Judge

Pending before the court are cross motions for judgment on the administrative

record in this bid protest action challenging the award of Contract No. W91238-17-C-

0025 ("Contract") to repair Lake Isabella Dam in central California to Flatiron | Dragados | Sukut Joint Venture ("FDS").  Contract Award, Tab 111 at AR 30277.  Plaintiff, Kiewit Infrastructure West Co. ("Kiewit"), challenges the decision of the United States Army Corps of Engineers ("the Corps") to award the repair Contract to FDS.  For the reasons set forth below, the court finds that the Corps' decision to award the Contract to FDS was in accordance with law and was not arbitrary or capricious.  Accordingly, the court **GRANTS** the motions of the United States and FDS for judgment on the administrative record and **DENIES** the motion of Kiewit.

## I.   BACKGROUND FACTS

### A.   The Lake Isabella Dam Project—The Solicitation

The Lake Isabella Dam was constructed to "provide flood risk management benefits to the town of Lake Isabella, CA and Bakersfield, CA."  Isabella Dam Safety Mod. Rep., Tab 1 at AR 44.  In 2012, the Corps determined that the dam required significant repairs.  *Id.* at AR 1, 3.  The repairs are necessary for flood control.  *Id.* at AR 13, 45-46.  Specifically, the Corps has determined that addressing the condition of Lake Isabella Dam is critical to prevent dam failure.  *Id.* at AR 13.

On March 30, 2017, the Corps issued Solicitation No. W91238-17-R-0006 ("Solicitation") requesting proposals for construction services to repair Lake Isabella Dam.  Solicitation, Tab 23 at AR 1391.[1]  The Solicitation provided that proposals would

---

[1] A total of eight solicitation amendments were issued: Amendment 0001 (April 3, 2017), Tab 40; Amendment 0002 (April 7, 2017), Tab 42; Amendment 0003 (April 14, 2017), Tab 43; Amendment 0004 (April 21, 2017), Tab 44; Amendment 0005 (April 28, 2017), Tab 45;

be evaluated using the best-value tradeoff process pursuant to section 15.101-1 of the

Federal Acquisition Regulation ("FAR").  *Id.* at AR 1462 (¶ 1.2, 1.3).  This process

permits tradeoff among price and non-price factors and allows the government to accept a

proposal other than the lowest-priced one.  *See* FAR § 15.101-1.  In this connection, the

Solicitation stated that the non-price factors specified were significantly more important

than price.  Solicitation, Tab 23 at AR 1475-76.  The six non-price factors are listed in the

Solicitation in descending order of importance: technical plan for excavation and

earthwork; management approach; experience and capability; technical plan for concrete

production and placement; past performance; and small business participation

commitment document.  *Id.* (¶ 7).

The Solicitation included a description for each evaluation rating: Outstanding;

Good; Acceptable; Marginal; and Unacceptable (from highest rating to lowest rating).  *Id.*

at AR 1472-73 (¶ 5.9).  An "Outstanding" rating meant the proposal provides "an

exceptional approach and understanding of the requirements and contains multiple

strengths, [while the] risk of unsuccessful performance is low."  *Id.* at AR 1472 (¶ 5.9).

A "Good" rating meant the proposal provides "a thorough approach and understanding of

the requirements and contains at least one strength, [while the] risk of unsuccessful

performance is low to moderate."  *Id.*  An "Acceptable" rating meant the proposal "meets

[the] requirements and indicates an adequate approach and understanding of the

requirements, [while the] risk of unsuccessful performance is no worse than moderate."

---

Amendment 0006 (May 1, 2017), Tab 46; Amendment 0007 (June 28, 2017), Tab 89; and
Amendment 0008 (July 6, 2017), Tab 95.

*Id.* at AR 1473 (¶ 5.9).  A "Marginal" rating meant the proposal "has not demonstrated an adequate approach and understanding of the requirements, and/or [the] risk of unsuccessful performance is high." *Id.*  Finally, an "Unacceptable" rating meant the proposal "does not meet [the] requirements of the solicitation, and thus, contains one or more deficiencies, and/or [the] risk of unsuccessful performance is unacceptable." *Id.*

Under the Solicitation, each offeror's past performance would also be evaluated and assigned an adjectival rating based on the relevancy of the offeror's past projects and the reviewers' overall confidence.  *Id*. at AR 1473-74 (¶ 5.10).  Relevancy was rated as Not Relevant, Somewhat Relevant, Relevant, or Very Relevant (from lowest rating to highest rating).  *Id*. at AR 1473 (¶ 5.10).  The overall confidence of the Corps based on the past performance of a given offeror was rated as No Confidence, Limited Confidence, Neutral Confidence, Satisfactory Confidence, or Substantial Confidence (from lowest rating to highest rating).  *Id*. at AR 1474 (¶ 5.10).  Finally, each offeror's small business participation would be evaluated and assigned an adjectival rating of Unacceptable, Marginal, Acceptable, Good, or Outstanding (from lowest rating to highest rating).  *Id*. (¶ 5.11).

**B.   Evaluation and Award**

To perform the source selection, the Corps established a multi-tier Source Selection Evaluation Board ("SSEB") made up of boards selected for their expertise and professional judgment that included a technical factor evaluation board, a past performance board, a small business evaluation board, and a price evaluation board. Source Selection Plan, Tab 21 at AR 1228; Rev. SSAC Rep., Tab 107 at AR 30226.  To

maintain the integrity of the evaluation process, the various technical boards were not given any price information.  Rev. SSAC Rep., Tab 107 at AR 30226-27.  The price evaluation was kept separate.  *Id.*

The findings and judgments of the technical evaluation boards were reviewed by a Source Selection Advisory Council ("SSAC").  Rev. SSAC Rep., Tab 107.  An SSAC is required for Department of Defense procurements exceeding $100 million.  Final Acquisition Plan, Tab 20 at AR 1051.  The SSAC was tasked with ensuring that the evaluation criteria set forth in the Solicitation were followed.  Initial SSAC Report, Tab 73 at AR 28055.  The SSAC compared the evaluations and ranked the technical merit of each offeror.  *Id.*  The SSAC determined that FDS had the highest rated technical proposal based on it receiving an "Outstanding" rating for the second and fourth technical factors.  *Id.*  The reports of the SSEB and SSAC were then sent to the Source Selection Authority ("SSA") for decision.  Competitive Range Determination, Tab 74.

The SSA's first task was to establish the competitive range.  *Id.* at AR 28066.  Six offerors submitted proposals in response to the Solicitation: Kiewit; OHL USA/Lane Construction Joint Venture; Fisher Industries; FDS; Granite Construction Company; and Barnard/Ames Construction Company Joint Venture.  *Id.* at AR 28059.  Kiewit, FDS, Granite, and Barnard/Ames were selected for the competitive range.  *Id.* at AR 28061.  Each offeror in the competitive range submitted revised proposals after having discussions with the Corps.[2]  Based on the revisions, the Corps conducted another round

---

[2] FDS Evaluation Notice, Tab 76 and Kiewit Evaluation Notice, Tab 78 of the Administrative Record.

of evaluations.  Rev. SSAC Rep., Tab 107 at AR 30228-38.  The SSAC also made its

recommendation as to best value.  While acknowledging that Kiewit had a lower price,

the SSAC recommended that the award go to FDS based on its conclusion that FDS had

vast technical superiority.  *Id.* at AR 30230-38.  Kiewit's and FDS's final evaluation

ratings and prices are summarized below:

| Offeror | Factor 1 – Technical Plan | Factor 2 – Management Approach | Factor 3 – Experience & Capability | Factor 4 – Technical Plan for Concrete Plan & Participation | Factor 5 – Past Performance | Factor 6 – Small Business Participation | Price** |
|---------|---------------------------|-------------------------------|-----------------------------------|-----------------------------------------------------------|----------------------------|----------------------------------------|---------|
| Kiewit | Good | Outstanding | Good | Outstanding | Substantial Confidence | Good | $231,567,079.50 |
| FDS | Outstanding | Outstanding | Outstanding | Outstanding | Satisfactory Confidence* | Acceptable | $241,751,065.00 |

*Changed by the SSA.  **The independent government estimate ("IGE") was $300 million.

SSDD, Tab 109 at AR 30271.

Having concluded that the competition was between FDS and Kiewit, the SSA

engaged in a best-value tradeoff decision to determine whether FDS's offer justified the

4.4 percent price premium.  *Id.* at AR 30262-71.  In the ten-page best-value tradeoff

decision included in the Source Selection Decision Document ("SSDD"), the SSA

documented his decision that the added value and benefits the government would receive

from awarding the contract to FDS justified FDS's higher price.  *Id.* at AR 30262-72.  He

focused his review on the technical factors for which FDS's ratings were superior to

those of Kiewit.  In general, FDS earned twice the number of "significant strengths" and

"strengths" earned by Kiewit.  *See* FDS Rev. Proposal, Tab 99; Kiewit Rev. Proposal,

Tab 98.  The two major factors that differentiated the two proposals were technical

factors 1 and 3.

In comparing FDS and Kiewit under technical factor 1, i.e., the most important

factor, the SSA explained that the SSAC had found FDS to be superior in every major

aspect of said factor.  Rev. SSAC Rep., Tab 107 at AR 30231-33.  The SSA noted that

the SSEB's final ratings of Kiewit (Rev. SSEB Rep., Tab 106 at AR 30145-48) and FDS

on technical factor 1 (Rev. SSEB Rep., Tab 106 at AR 30148-52) also demonstrated that

FDS had a superior proposal.

The SSA, in his evaluation of technical factor 1, reviewed the basis for Kiewit's

"Good" rating and noted that FDS's proposal for technical factor 1 was "superior" to

Kiewit's because FDS had "demonstrated a better understanding of the existing site

conditions and project requirements."  SSDD, Tab 109 at AR 30263.  The SSA noted that

FDS's "exceptional approach . . . resulted in a lower risk of unsuccessful performance."

*Id.*  In this connection, the SSA noted that the "detailed analysis" in FDS's plans would

"minimize disruptions and delays to the project" and this "provide[d] added value to the

Government."  *Id.*  The SSA found that FDS's proposed use of a geologist compared with

Kiewit's use of a geotechnical engineer would "optimize the use of" the materials

available and "minimize the risk of costly quantity overruns to the Government for

processed materials."  *Id.*  The SSA further noted that FDS had "a superior understanding

of the geologic and hydrogeologic site conditions" associated with the Auxiliary Dam

and that FDS's superior knowledge of site conditions in connection with dewatering

added significant value.  *Id.* at AR 30264.  In this connection, the SSA noted that

Kiewit's assumption that the Auxiliary Dam site had low permeable soil was questioned by the SSAC. *Id.*

The SSA also determined that FDS provided extra value to the government based on FDS's past experience under technical factor 3—the other factor for which FDS received an "Outstanding" rating, as compared to Kiewit's "Good" rating. *Id.* at AR 30265-66. The record shows that the Corps was especially interested in prior projects "that demonstrate experience with a zoned embankment dam combined with a concrete spillway" like Lake Isabella Dam. Solicitation, Tab 23 at AR 1471. FDS provided three examples of prior projects with this feature. FDS Rev. Proposal, Tab 99 at AR 28822-23, 28828-30, 28831-33 (Portugues Dam, L'Albages Dam, and Villalba de los Barros Dam). Based on this experience, as well as the fact that FDS submitted six prior projects, exceeding the three required projects, FDS received a significant strength. Rev. SSEB Rep., Tab 106 at AR 30180; SSDD, Tab 109 at AR 30265. FDS was the only offeror that had done more than one project on the same type of dam as Lake Isabella Dam. FDS also received a significant strength based on its prior experience working on a dewatering project with a partial reservoir pool, the Villalba de los Barros Dam. FDS Rev. Proposal, Tab 99 at AR 28831-33; Rev. SSEB Rep., Tab 106 at AR 30180. *See also* SSDD, Tab 109 at AR 30265. The SSA noted that the SSAC had determined that this dewatering experience warranted a significant strength. SSDD, Tab 109 at AR 30261. The SSA agreed that FDS's proposal warranted an "Outstanding" rating for technical factor 3 on the grounds that its experience was unmatched by any other offeror. *Id.* at AR 30266. The SSA stated that FDS's "experience in earth and rockfill embankment dam and

spillway construction, seismic dam remediation, and dewatering with a partial pool reservoir are a significant added value to the Government and are expected to greatly reduce risk for timely project completion." *Id.*

In deciding to select FDS, the SSA also reviewed whether Kiewit's and FDS's price proposals were "fair and reasonable[.]" Solicitation, Tab 23 at AR 1472. The Solicitation provided that the "[p]rice analysis may involve comparison with other proposed prices received in response to this solicitation" and identified the techniques mentioned in section 15.401-1(b)(2) of the FAR. *Id.* The SSA noted that there could be a 15 percent quantity overrun with respect to the Emergency Spillway Excavation, which would make Kiewit's proposal more expensive. SSDD, Tab 109 at AR 30270. The SSA also noted that there were some uncertainties in Kiewit's price regarding stockpiling materials. *Id.* The SSA also noted that FDS's price proposal was reviewed to ensure it was not unbalanced and that it was ultimately determined to be balanced. *Id.* Finally, the SSA concluded that the 4.4 percent or $10,183,985.50 million price difference between Kiewit's and FDS's proposals was "not significant." *Id.*

The SSA also reviewed each of the remaining factors and concluded in the summary that FDS "provided a far superior technical proposal albeit at a slightly higher price." *Id.* at AR 30271. The SSA stated that the 4.4 percent price difference between FDS and Kiewit was "not significant" and that there were "potential cost risks" associated with Kiewit's proposal that could result in Kiewit's proposal costing more. *Id.* at AR 30270. The SSA also noted that FDS's proposal would likely provide significant cost savings to the Corps because FDS was likely to finish the project early, thus

minimizing the Corps' costs of oversight.[3]  *Id.* at AR 30265.  The SSA explained his

conclusion that FDS's proposal offered the best value to the Corps as follows: FDS

"demonstrated a better understanding of existing site conditions and challenges, a

superior identification of risks and associated mitigation strategies, and superior expertise

and relevant experience that [it] will bring to accomplish the work."  *Id.* at AR 30271.

The SSA explained that due to FDS's "Outstanding" rating for technical factor 1, i.e., the

most important factor, FDS "immediately set themselves apart from the other Offerors as

extremely knowledgeable of the project requirements, site conditions, project risks and

overall technical approach."  *Id.*  The SSA noted that the Corps had "determined [FDS's]

strategies are expected to provide significant cost savings to the Government which will

exceed the 4.4% price proposal difference by minimizing change orders, rework, delays,

and associated Government oversight costs."  *Id.*  With regard to technical factor 2, the

SSA noted the benefit of FDS's likely ability to complete the project early constituted "an

additional benefit to the Government[.]"  *Id.*  Regarding technical factor 3, the SSA noted

that FDS's "worldwide" experience in building dams similar to the Isabella Lake Dam

gave the Corps added assurance that the project would be successfully completed.  *Id.*

The SSA concluded that this additional experience gave FDS a "better understanding of

the [project] requirements and site conditions[,]" including FDS's better dewatering plan,

FDS's plan to use a full-time on-site geologist, and FDS's projected faster time schedule.

---

[3] FDS proposed to finish the project *** days early.  The Corps determined this would reduce its overall costs by approximately $1 million and was an important benefit to the government.  SSDD, Tab 109 at AR 30265.

*Id.* For all of these reasons, and those stated in the ten-page best-value tradeoff decision, the SSA determined that FDS "represents the overall best value to the Government for this solicitation." *Id.*

On September 18, 2017, the Corps awarded the Contract to FDS and informed Kiewit that it was not the successful offeror.  Contract Award, Tab 111 at AR 30277-78.

### C.   Post-Award Proceedings

Kiewit received the required FAR § 15.506 debriefing on September 26, 2017. Kiewit Debrief. Memo, Tab 117 at AR 30416.  Thereafter, on October 2, 2017, Kiewit protested the award to FDS before the Government Accountability Office ("GAO") and submitted a supplemental protest on November 13, 2017.  Kiewit Protest, Tab 122; Protestor's Comments to Agency Rep. & Supp. Protest Grounds, Tab 137 at AR 30773-809.  After consideration of the agency report, Kiewit's comments, and FDS's comments, the GAO denied Kiewit's protest and supplemental protest.  *Kiewit Infrastructure West Co.*, B-415421; B-415421.2 (December 28, 2017) at 1, Tab 142 at AR 30940.

Kiewit filed the present action in this court on January 16, 2018.  Kiewit's Compl. Declaratory & Inj. Relief (ECF No. 1).  In its cross motion for judgment on the administrative record, Kiewit raises the following basic objections to the Corps' decision to award the Contract to FDS.  First, Kiewit argues that the Corps conducted an improper best-value tradeoff decision by allegedly conducting a cost realism or price realism analysis regarding Kiewit's pricing of certain materials.  Kiewit's Mem. Supp. Mot. Inj. Relief, Declaratory Relief, & J. on Admin. R. ("Kiewit's MJAR"), ECF No. 34-1, at 12-20.  Second, Kiewit argues that the Corps failed to explain why Kiewit did not get an

"Outstanding" but only a "Good" rating for technical factor 1.  *Id.* at 20-4.  Third, Kiewit

argues that the technical discriminators the Corps applied to evaluate FDS's and Kiewit's

proposals were irrational.  *Id.* at 24-32.  Fourth, Kiewit argues that the Corps engaged in

disparate treatment in its evaluation of Kiewit's and FDS's proposals.  *Id.* at 32-53.  Fifth,

Kiewit argues that the Corps' evaluation of Kiewit's and FDS's proposals for technical

factors 3 and 5 was unreasonable and arbitrary and capricious.  *Id.* at 53-60.

The government and FDS have responded to each of Kiewit's arguments and

contend that Kiewit has not demonstrated that the Corps' award decision should be set

aside.  Def.'s Mot. J. on Admin. R. ("Def.'s MJAR"), ECF No. 35, at 36-61; FDS Mem.

Supp. Mot. J. on Admin. R. ("FDS's MJAR"), ECF No. 33, at 16-47.  Briefing is

complete and oral argument was held on March 23, 2018.

## II.     DISCUSSION

### A.     Standards of Review

This court hears bid protests under 28 U.S.C. § 1491(b)(1).  Under section

1491(b)(4), the court reviews the agency's procurement decision to determine whether it

was arbitrary or capricious or not in accordance with law.  *Impresa Construzioni Geom.*

*Domenico Garufi v. United States*, 238 F.3d 1324, 1332 & n.6 (Fed. Cir. 2001).

Examples of arbitrary and capricious action include situations where the agency

"'entirely failed to consider an important aspect of the problem, offered an explanation

for its decision that runs counter to the evidence before the agency, or [the decision] is so

implausible that it could not be ascribed to a difference in view or the product of agency

expertise.'"  *Alabama Aircraft Indus., Inc.-Birmingham v. United States*, 586 F.3d 1372,

1375 (Fed. Cir. 2009) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).  In evaluating whether a procurement official's actions were rational, "the disappointed offeror bears a heavy burden[.]" *Impresa*, 238 F.3d at 1333.  De minimis errors in the procurement process do not justify relief.  *Grumman Data Sys. Corp. v. Dalton*, 88 F.3d 990, 1000 (Fed. Cir. 1996).  In addition, even if the court concludes that the agency erred in its selection decision, the protestor must also establish that it was prejudiced by the government's error.  *Advanced Data Concepts, Inc. v. United States*, 216 F.3d 1054, 1057 (Fed. Cir. 2000).  In order to establish the requisite prejudice, a protestor must show that but for the error "'there was a reasonable likelihood that [it] . . . would have been awarded the contract.'"  *Id.* (quoting *Data General Corp. v. Johnson*, 78 F.3d 1556, 1562 (Fed. Cir. 1996)).  This "standard reflects a reasonable balance between the importance of (1) averting unwarranted interruptions of and interferences with the procurement process and (2) ensuring that protesters who have been adversely affected by allegedly significant error in the procurement process have a forum available to vent their grievances." *Data General Corp.*, 78 F.3d at 1563.  In reviewing best-value determinations, like the one at issue in this case, the agency has significant discretion.  *Galen Medical Assoc., Inc. v. United States*, 369 F.3d 1324, 1330 (Fed. Cir. 2004); *E.W. Bliss Co. v. United States*, 77 F.3d 445, 449 (Fed. Cir. 1996).

> **B.    The SSA's Best-Value Tradeoff Decision Was Rational and in Accordance with Law**

Kiewit's principal legal objection to the Corps' selection of FDS is that the Corps acted outside the scope of the Solicitation's evaluation criteria and the FAR when the

SSAC in its best-value analysis and subsequent recommendation identified certain cost risks in Kiewit's proposal and credited FDS with certain cost savings to the government, which were then adopted by the SSA in his best-value tradeoff decision.  Kiewit's MJAR at 12-20.  Kiewit contends that once the SSA had determined that Kiewit's price was "fair and reasonable," the SSA should have ended his price analysis at that point, i.e., the SSA should not have considered possible cost risks and/or savings.  Kiewit's MJAR at 14. Kiewit contends that the Corps' consideration of cost risks with regard to Kiewit's proposal constituted an unlawful "cost realism" analysis.  Kiewit's MJAR at 13-14 (citing FAR § 15.404-1(d)(1)).[4, 5]  Kiewit also argues that the SSA's conclusion that FDS's proposal would likely lead to potential cost savings to the government that would "exceed the 4.4% price difference" was not supported and should not have been considered in the best-value tradeoff decision.  *Id.* at 15.

### 1. The SSA's Consideration of Cost Risks in the Best-Value Tradeoff Decision

With regard to Kiewit's argument concerning the SSA's consideration of potential cost risks in Kiewit's proposal, the court finds, first, that the Corps' evaluation of prices

---

[4] FAR § 15.404-1(d)(1) provides: "Cost realism analysis is the process of independently reviewing and evaluating specific elements of each offeror's proposed cost estimate to determine whether the estimated proposed cost elements are realistic for the work to be performed; reflect a clear understanding of the requirements; and are consistent with the unique methods of performance and materials described in the offeror's technical proposal."
[5] In essence, Kiewit argues that by using cost realism concepts like "cost risk" and "uncertain cost risks," which are not "fair and reasonable" price concepts in the SSDD, the SSAC and SSA effectively conducted an "additional price analysis" that went further than the $10 million price difference between the two proposals, concluding that there would be no cost advantage in an award made to Kiewit despite said difference.  Kiewit's MJAR at 4-5 (citing Rev. SSAC Rep., Tab 107 at AR 30236, 30238; SSDD, Tab 109 at AR 30270-71).

was consistent with the terms of the Solicitation.  Contrary to Kiewit's contentions, the Solicitation did not limit the Corps' review to total price.  The Solicitation required all offerors to organize their bid prices by contract line item number ("CLIN").  Solicitation, Tab 23 at AR 1464.  Each CLIN was divided into sub-CLINs and each sub-CLIN had its own unit price.  *Id.*  For example, the offerors were required to provide a specific dollar amount to be charged per cubic yard of material removed.  Under the Solicitation, the SSEB price board was required to review each proposal based both on the total price and the price of the individual CLINs.  Initial Price Analysis, Tab 71 at AR 27939.  More specifically, the SSEB price board was required to review each CLIN's price to determine whether it was "fair and reasonable" based on the price falling either "within one standard of deviation or 25% of the average of all offerors (excluding the IGE)."  *Id.*  In view of the foregoing, the SSA's consideration of the unit prices of individual CLINs was not inconsistent with the terms of the Solicitation.

Second, the court finds that the SSA's consideration of potential cost risks based on Kiewit's unit pricing as set forth in its CLINs did not amount to an unlawful cost realism analysis.  In its price board report, the SSEB provided an analysis of aspects of eight CLINs in Kiewit's proposal.  Initial Price Analysis, Tab 71 at AR 27943-45.  For instance, the SSEB noted that Kiewit's proposed price of *** per cubic yard for the emergency spillway rock excavation (CLIN 007AB) was much higher than FDS's proposed price of *** per cubic yard.  *See* Kiewit Rev. Proposal, Tab 98 at AR 28515; FDS Rev. Proposal, Tab 99 at AR 29020.  When the SSAC undertook its review, it noted this disparity and asked the SSEB price board to assess how the difference in unit price might affect overall

price if the number of cubic yards to be excavated under CLIN 007AB exceeded 2.5 million cubic yards, i.e., the fixed quantity set in the Solicitation.  Rev. SSAC Rep., Tab 107 at AR 30236.  The SSEB price board did an analysis assuming a 15 percent increase in the volume of material to be excavated under CLIN 007AB based on previous historical data of similar projects.  *Id.*  Due to Kiewit's higher unit price, the SSAC noted that if there were a 15 percent increase in cubic yards to be excavated, the difference between Kiewit's price and FDS's price would narrow significantly.  *Id.*  Kiewit argues that the use of an "undocumented, unsupported hypothetical overrun[,]" here the 15 percent increase, was arbitrary and thus the SSA erred in considering Kiewit's potential cost increase in the best-value tradeoff decision under this Solicitation.  Kiewit's MJAR at 4-5.

The SSAC also examined Kiewit's *** per cubic yard price under CLINs 0009AB-AJ for stockpiling sand.  Rev. SSAC Rep., Tab 107 at AR 30236.  The SSAC chose to examine the price of CLINs 0009AB-AJ because Kiewit included a different price for stockpiling sand in other CLINs that was higher.  *Id.*  The SSAC noted that if there were variations in quantity or if the project (i.e., the Auxiliary Dam) was not executed within the first option year, Kiewit's price would be higher.  *Id.*  Kiewit challenges the consideration of this cost risk by the SSA in the best-value tradeoff decision.  Kiewit's MJAR at 19; *see also* SSDD, Tab 109 at 30270.

The court agrees with the government and FDS that the review of cost risks as part of the best-value tradeoff decision was not an unlawful cost realism analysis or otherwise unlawful.  Def.'s MJAR at 45-46; FDS's MJAR at 30-32.  Cost realism, as the government and FDS explain, is a systematic analysis of cost estimates conducted when a

cost reimbursement contract is contemplated in order to assure that the offeror does not understate likely costs, thereby misleading the proposal evaluator.  *See* FAR § 15.404-1(d)(1)-(2).  Where the agency determines that a proposal has understated likely costs, the agency's estimate of those likely costs ("probable costs") is substituted for the offeror's price and used for the purposes of proposal evaluation.  FAR § 15.404-1(d)(2)(i)-(ii).  Here, the SSA did not substitute Kiewit's prices with prices noted by the SSAC. Rather, the SSA simply stated that Kiewit's price could be higher under certain contingencies.  Describing a cost risk in the best-value tradeoff decision was not unlawful.  Based on the court's review of the record and the SSA's best-value tradeoff decision, it is clear that the SSA did not engage in a cost realism analysis and, further, the SSA's identification of potential cost risks presented by Kiewit's proposal under certain contingencies was in accordance with law.

## 2.  The SSA's Consideration of Cost Savings in the Best-Value Tradeoff Decision

With regard to Kiewit's contention that the SSA improperly considered anticipated cost savings by selecting FDS's proposal, the court finds as follows.  In his ten-page best-value tradeoff decision, the SSA included, as discussed in detail above in the Background Facts, a head-to-head comparison between Kiewit's and FDS's proposals concerning the six technical factors, with factor 1 being the most important and factor 6 being the least important.  SSDD, Tab 109 at AR 30262-72.  At the end of that analysis, the SSA expressly found that FDS's proposal was "far superior" and worth the "slightly higher [4.4 percent] price."  SSDD, Tab 109 at AR 30271.  As discussed below, because of the SSA's

extensive review of the proposals, his conclusions regarding the benefits of FDS's proposal are not undermined by his failure to provide detailed support for his conclusions regarding the cost savings he anticipated the Corps will also receive from selecting FDS's superior technical proposal. The comments on cost savings, following his thorough comparison, were extraneous to his ultimate decision to select FDS's proposal and do not undermine the SSA's best-value tradeoff decision.

For technical factor 1 (technical plan for excavation and earthwork), the SSA rated Kiewit's proposal as "Good" based on the two significant strengths and the five strengths assigned to it by the SSEB and the SSAC. SSDD, Tab 109 at AR 30262-63. The significant strengths included a cofferdam and Kiewit's consideration of three dewatering systems before execution, while the strengths included "Just-In-Time production of material, use of a geotechnical engineer on site, emphasis on blasting and excavation safety, [and] specialized equipment to accomplish narrow fills and [its] approach to vertical placement." *Id.* The SSA noted, however, that "there remained one uncertainty in [Kiewit's] plan regarding stockpiling material" based on the SSEB's "concern that the large quantity of Zone 4B material may not fit in the designated location," which could ultimately "cause double handling, contractor/production inefficiencies and risks to schedule." *Id.* at AR 30263. FDS, on the other hand was rated as "Outstanding" by the SSA because it was assigned four significant strengths and eight strengths by the SSEB and the SSAC. *Id.* The significant strengths included an upstream berm, excellent understanding of the existing project geology and inclusion of an on-site geologist to "assess the quality of materials available for processing and placement which will

optimize excavation and efficient material usage," mitigation strategies for material processing to account for losses, and an "excellent" dewatering plan that addressed both site conditions and the effects of drought on the site, which Kiewit had not addressed. *Id.* The eight strengths assigned to FDS included a "comprehensive plan to protect and manage stockpiles, a QC plan for material gradations, a plan to direct haul common material to avoid stockpiling, [and] a detailed and well thought out haul road map and management plan for transporting materials." *Id.*  In view of the foregoing significant strengths and strengths, the SSA concluded that because "[technical] factor 1 was the most important factor, [FDS] immediately set themselves apart from the other Offerors as extremely knowledgeable of the project requirements, site conditions, project risks and overall technical approach." *Id.* at AR 30271.  The SSA found that FDS's proposal was "superior" to Kiewit's because it "demonstrated a better understanding of the existing site conditions and the project requirements. . . . [FDS's] exceptional approach and understanding of the requirements and the many strengths in [its] proposal resulted in a lower risk of unsuccessful performance to the Government compared to [Kiewit's] approach." *Id.* at AR 30263.  In addition, the SSA stated that FDS's analysis was "more comprehensive" than Kiewit's in terms of risk mitigation, explaining that "[FDS's] detailed analysis [would] minimize disruptions and delays to the project and ultimately provide[] added value to the Government." *Id.*  In view of the foregoing, the SSA's conclusion that FDS's proposal was worth more than Kiewit's is fully explained for technical factor 1.

Regarding technical factor 2 (management approach), both FDS and Kiewit received an "Outstanding" rating, with Kiewit being awarded four significant strengths and 12 strengths and FDS being awarded six significant strengths and 16 strengths. *Id.* at AR 30264-65. The SSA explained that both Kiewit and FDS "demonstrated an exceptional management approach and understanding of the requirements for Factor 2." *Id.* at AR 30265. Nevertheless, the SSA noted that there was added value in FDS's proposal based on FDS proposing to finish the entire project \*\*\* days earlier, thus putting FDS ahead of Kiewit by \*\*\* days.[6] *Id.* The SSA therefore concluded that FDS's "earlier finish date is an added value and benefit, because it represents a tangible cost savings to the Government," amounting to approximately $1 million. *Id.*

For technical factor 3 (experience and capability), Kiewit was rated as "Good" and awarded one significant strength because it submitted six projects that exceeded the required three projects, and six strengths, which included "experience at remote site locations . . . and experience with a dewatering system similar to [Kiewit's] proposed system for [Lake] Isabella Dam." *Id.* FDS, on the other hand, was rated as "Outstanding," receiving two significant strengths, one of which was attributed to FDS's submission of six projects which exceeded the required three projects, while the other was awarded because of FDS's dewatering experience. *Id.* FDS also received four strengths, including "experience at a remote site [and] experience with rockfill and zone[d]

---

[6] In its revised proposal, Kiewit went from a completion date of \*\*\* days early to \*\*\* days early, which the SSA noted was "most likely due to an original weakness about proposing double shifts." SSDD, Tab 109 at AR 30265.

20

embankments." *Id.*  The SSA found that FDS's proposal was "superior" to Kiewit's proposal because it "demonstrated more experience and capability than [Kiewit] on projects similar to [Lake] Isabella [Dam]." *Id.* at AR 30266.  The SSA concluded that FDS's "worldwide expertise and experience in dam and spillway construction," as well as its experience in "seismic dam remediation, and dewatering with a partial pool reservoir[,] [were] a significant added value to the Government and [were] expected to greatly reduce risk for timely project completion." *Id.*

For technical factor 4 (technical plan for concrete production and placement), both FDS and Kiewit received an "Outstanding" rating. *Id.* at AR 30266.  Kiewit was awarded three significant strengths, which included "providing a preliminary mix design and thermal analysis for [its] concrete production," and ten strengths, including the insertion of "a thorough discussion on concrete cooling and demonstrated experience in multiple methods of cooling concrete . . . discuss[ing] hazardous material considerations at the Main Dam Control Tower and propos[ing] the use of a tent system to be utilized for physical protection of their aggregate stockpiles." *Id.*  FDS was awarded seven significant strengths, which included "an extensive rationale and arguments for [its] selected method of pumping concrete instead of utilizing buckets or other methods [and] a well-thought out approach to rebar and formwork across all concrete features," and 13 strengths, including "multiple hot weather concrete placement mitigation strategies and multiple means of cooling concrete, planning for an onsite lab to control concrete production . . . and a thorough plan for controlling joint offset for all concrete structures." *Id.* at AR 30266-67. Although both Kiewit's and FDS's proposals were rated as "Outstanding" for technical

factor 4, the SSA nevertheless concluded that FDS's design of the "concrete mix for a maximum of 130 degree Fahrenheit (F) internal temperature versus the specification maximum of 158 degrees F [would] significantly reduce[] the risk of exceeding maximum concrete temperatures during construction and subsequently having to reject or tear out concrete." *Id.* at AR 30267.   Moreover, the SSA concluded that FDS's "plan to leave the formwork on for 7 days versus 5 days is also a significant benefit to the project by allowing recently placed concrete to cure and gain additional strength before exposure to the elements." *Id.*   The SSA concluded that these benefits, which were only attributed to FDS's proposal, are "an added value to the Government and a risk reduction measure due to the project's location in an arid and windy climate." *Id.*

For technical factor 5 (past performance), the SSAC gave both Kiewit and FDS a rating of "Substantial Confidence" after discussions with the Corps concerning their revised proposals. *Id.* at AR 30268.   Nevertheless, the SSA changed FDS's rating to "Satisfactory Confidence" in the SSDD. *Id.*   FDS submitted five projects for consideration, one of which was considered "Very Relevant," two "Relevant," and two "Somewhat Relevant," with "*performance ratings ranging from Satisfactory to Very Good*." *Id.* at AR 30268 (emphasis in the original).   However, because FDS submitted only five projects instead of the required six, the SSA determined that FDS's proposal warranted the lower rating of "Satisfactory Confidence" instead of "Substantial Confidence." *Id.*   Kiewit, on the hand, received a rating of "Substantial Confidence" because of the six projects submitted. *Id.*   Kiewit had one "Very Relevant", three "Relevant, and two "Somewhat Relevant" projects, with "*performance ratings ranging*

*from Satisfactory to Exceptional.*" *Id.* at AR 30267-68 (emphasis in the original).

However, despite the lower rating given to FDS, the SSA concluded that said rating did

"not change the quality of [FDS's] overall proposal's strengths and weaknesses." *Id.* at

AR 30268.

Finally, for technical factor 6 (small business participation commitment document),

i.e., the least important of all the technical factors, Kiewit was rated as "Good," whereas

FDS was rated as "Acceptable." *Id.* Kiewit met the overall small business goal of 15

percent and "exceeded the goals in two" of the five sub goals, but failed to meet the goals

in two other sub goals. *Id.* at AR 30269. Moreover, Kiewit "provided a letter of

commitment with Jensen Drilling[,]" a sub-contractor. *Id.* Although it surpassed the

overall small business goal, FDS "did not meet the small business sub goals and did not

include letters of commitment," which is why it was rated lower than Kiewit. *Id.*

Nevertheless, the SSA agreed with the SSAC that there was no "significant difference in

value between [Kiewit and FDS] for this factor," and that FDS had "included small

business pricing in [its] proposal." *Id.*

In view of the foregoing, it is clear that the SSA's conclusion that FDS's proposal

was far superior to Kiewit's and worth the slightly higher 4.4 percent price tag was based

on his extremely thorough head-to-head comparison of Kiewit's and FDS's proposals and

not on any improper factors. The court finds that his comments on the specific cost

savings the SSA expected the Corps would receive if FDS was selected were extraneous

to his best-value tradeoff analysis. The SSA's final best-value tradeoff decision was

properly focused on FDS's vastly superior technical proposal, which the SSA fully

supported with specific details.  In such circumstances, the fact that the SSA did not identify in the record the basis for the savings he calculated that the government would receive by selecting FDS's proposal does not undermine the integrity of the SSA's best-value tradeoff decision.

### C.   Kiewit's "Good" Rating on Technical Factor 1

Kiewit next argues that the Corps erred in awarding the Contract to FDS because the Corps failed to explain why Kiewit received a final rating of "Good" instead of "Outstanding" on technical factor 1.  Kiewit's MJAR at 20-24.  Kiewit does not contend that its proposal was inconsistent with a "Good" rating under the criteria set forth in the Solicitation.  Rather, Kiewit contends that the Corps failed to explain why it did not receive an "Outstanding" rating for technical factor 1 after Kiewit successfully addressed the two significant weaknesses, four weaknesses, and three of the four uncertainties assigned to it under said factor before discussions with the Corps.  *Id.*  Kiewit explains that because it had a "Good" rating with those weaknesses and uncertainties, the Corps should have to explain why its rating did not improve once it removed those weaknesses and uncertainties in its revisions.  *Id.* at 20-21.  The government and FDS argue that Kiewit is not entitled to an explanation so long as the "Good" rating it received is justified.  Def.'s Reply at 13-16; FDS's Resp. Opp. Pl.'s Mot. J. on Admin. R. ("Resp."), ECF No. 38, at 13; *see also* Rev. SSEB Rep., Tab 106 at AR 30148.  They argue that because Kiewit's "Good" rating for technical factor 1 is adequately explained, the Corps does not need to provide any additional explanation.

24

It is well settled that "technical rating decisions are the 'minutiae of the procurement process . . . which involve discretionary determinations of procurement officials that a court will not second guess." *T & S Prod., Inc. v. United States*, 48 Fed. Cl. 100, 104 (2000) (quoting *E.W. Bliss*, 77 F.3d at 449).  Here, the Solicitation expressly stated that in order to receive the rating of "Good" an offeror's proposal needed to provide "a through approach and understanding of the requirements[,] . . . contain[] at least one strength," and  present a "low to moderate" risk of unsuccessful performance. Solicitation, Tab 23 at AR 1472 (¶ 5.9).  To receive a rating of "Outstanding" the proposal had to provide "an exceptional approach and understanding of the requirements[,] . . . contain[] multiple strengths," and present a "low" risk of unsuccessful performance.  *Id*.  The difference between the two ratings therefore largely turned on whether the Corps found the proposed offeror's technical approach to be "thorough" and thus "Good" or "exceptional" and thus "Outstanding."  *Id.*  The court will not second-guess the Corps' judgment that Kiewit's proposal was "thorough" but not "exceptional." This is a matter of technical and scientific expertise to which the Corps is afforded the greatest deference.  *E.W. Bliss*, 77 F.3d at 449.

In addition, the court agrees with the government and FDS that the cases Kiewit relies on to support its position, *BayFirst Solutions, LLC v. United States*, 102 Fed. Cl. 677 (2012), *Caddell Construction Co. v. United States*, 111 Fed. Cl. 49 (2013), and *TRESP Associates, Inc.*, B-258322.5 (March 9, 1995), 96-1 CPD ¶ 8, are distinguishable from the present case and do not provide a basis for requiring additional agency review.

First, in *BayFirst* the Solicitation expressly required the agency to base a top rating of "Excellent" on the number of strengths and weaknesses assigned to an offeror. *BayFirst*, 102 Fed. Cl. at 686. As such, the agency's failure to explain the basis for a "weakness," which determined the rating, required a remand to the agency for an explanation. *Id.* Here, in contrast, the Solicitation did not provide that ratings would be based solely on the number of strengths and weaknesses. Rather, ratings would be based on the technical judgments of the SSEB and the SSAC. An "Outstanding" rating would be based on providing "an exceptional approach and understanding of the requirements[,]" whereas a "Good" rating would be based on providing "a thorough approach and understanding of the requirements[.]" Solicitation, Tab 23 at AR 1472 (¶ 5.9). The bases for FDS's "Outstanding" and Kiewit's "Good" ratings for technical factor 1 are set forth in a narrative contained in the record. The narrative clearly explains why FDS was given a higher rating than Kiewit. Nothing in the Solicitation required the SSA to also explain why Kiewit was not deserving of an "Outstanding" rating.

Second, nothing in *Caddell*, requires a different result. *Caddell* concerned the level of discussion needed in a best-value tradeoff decision. 111 Fed. Cl. at 109-11. The court held that a source selection decision required more than conclusory statements, without any record support. *Id.* (citing *Standard Commc'ns, Inc. v. United States*, 101 Fed. Cl. 723, 733 (citing *Serco Inc. v. United States*, 81 Fed. Cl. 463, 497 ("'Conclusory statements, devoid of any substantive content . . . fall short of the [FAR] requirement[.]'")). *Id.* Here, as discussed above, the reasons for finding FDS's proposal

superior to Kiewit's proposal were clearly articulated in the record.  No further explanation was required.

Third, *TRESP* is also distinguishable from the present case.  In *TRESP*, a rating system was employed under which number values were assigned based on the offeror's satisfaction of various factors and subfactors.  *TRESP*, B-258322.5 at 2-4.  Under that system, the GAO decided it was irrational not to add points to TRESP's rating after it had addressed certain failures following discussions.  *Id.* at 4-5.  The GAO determined that under the rating system devised, the agency needed to explain the basis for the final evaluation.  *Id.*  In the present case, however, the connection between the evaluation made by the Corps and the rating standard for "Good" in the Solicitation is rational and well documented.

For these reasons, the court finds that Kiewit has not met its burden of showing that the Corps erred when it failed to explain why Kiewit did not receive an "Outstanding" rating for technical factor 1.  The Corps provided a rational explanation as to why Kiewit received a "Good" rating and given the explanation provided for FDS's "Outstanding" rating, as well as the extensive comparison of the proposals set forth in the record, the court finds that the Corps adequately explained its technical judgment and that Kiewit is not entitled to an additional explanation as to why it did not receive an "Outstanding" rating for technical factor 1.

     **D.**     **The Discriminators the SSA Used for Finding that FDS Provided the Corps with a Superior Proposal Under Technical Factor 1 Were Rational**

Kiewit argues that three of the bases for the Corps' finding of FDS's proposal superior to Kiewit's for technical factor 1 were unreasonable or irrational.  Kiewit's MJAR at 24-32.  Each is addressed, in turn, below.

### 1.    The Corps Rationally Determined that FDS's Proposed Use of a Geologist Was a Significant Strength

Kiewit states it was unreasonable for the Corps to evaluate FDS's proposal for technical factor 1 as providing a significant strength based on FDS's proposed use of a geologist.  Kiewit's MJAR at 24-27.  Kiewit argues that by providing a geologist instead of a geotechnical engineer, FDS's proposal did not comply with the Solicitation's requirements.  *Id.*  Kiewit's argument is premised on its contention that FDS has proposed a geologist *instead of* a geotechnical engineer.  For the reasons that follow, the court finds that argument is without merit.

The court has reviewed FDS's proposal and agrees with FDS that its proposal requires FDS to provide a geotechnical engineer as well as a geologist.  FDS Rev. Proposal, Tab 99 at AR 28753.  In its proposal, FDS has certified that it will be providing a geotechnical engineer for the project, FDS Rev. Proposal, Tab 99 at AR 28951, as required by the specifications.  Specs., Tab 12 at AR 993.  The court finds that the Corps may reasonably rely upon FDS's certification to conclude that FDS will provide the required geotechnical engineer in order to meet the specifications *in addition to* the proposed geologist that the Corps identified as the basis for FDS's significant strength.  In *Allied Tech. Grp.*, the Federal Circuit held that "[w]here an offeror has certified that it meets the technical requirements of a proposal, the Contracting Officer is entitled to rely

on such certification in determining whether to accept a bid, and the offeror's potential

failure to comply with the proposal requirements is ordinarily 'a matter of contract

administration,' which does not go to the propriety of accepting the bid." *Allied Tech.*

*Grp., Inc. v. United States*, 649 F.3d 1320, 1330 (Fed. Cir. 2011) (quoting *Centech Grp.,*

*Inc. v. United States*, 554 F.3d 1029, 1039 (Fed. Cir. 2009) (internal citations omitted)).

Because FDS has certified that it will provide a geotechnical engineer, as required by the

Solicitation, *and* a geologist for this project, Kiewit's argument must be rejected.

> **2.    The Corps Rationally Gave FDS a Strength for its Superior Understanding of Soil Conditions**

Kiewit asserts that it was unreasonable for the Corps to distinguish between

Kiewit's and FDS's proposals for technical factor 1 based on FDS's recognition that

'"the Auxiliary Dam site is alluvial in nature,"' whereas Kiewit '"assumed a low

permeable soil which the SSAC did not consider accurate."'  Kiewit's MJAR at 29-30

(quoting Rev. SSAC Rep., Tab 107 at AR 30232; SSDD, Tab 109 at AR 30264)

(emphasis removed).  Kiewit argues that "alluvial" and "low permeability" mean the

same thing and, therefore, the difference in ratings had no technical merit.  *Id.* at 29-32.

Kiewit also argues that the Corps erroneously took exception to Kiewit's description of

the soil condition at the Auxiliary Dam as "low permeability."  *Id.*  For the reasons that

follow, this court will not second-guess the Corps on either of these technical judgments.

First, accepting the definition of "alluvial" provided by FDS, the court understands

that it refers to soil that was deposited by flowing water.  FDS's MJAR at 25 (citing J.L.

Boettinger, *Encyclopedia of Soils in the Environment, Alluvium and Alluvial Soils*, 45

(Daniel Hillel ed., Elsevier Ltd. 2005).  The term does not mean "low permeability."

Kiewit's citation to dictionary.com's definition of "alluvium" is consistent with this

conclusion, because the site also provides an example of the usage of "alluvial" as

meaning "unconsolidated soil."  *See* http://www.dictionary.com/browse/alluvial?s=t.

Thus, the Corps' criticism is supported.

Kiewit's claims regarding the low permeability of the soil are also unsupported.

Kiewit's support for its position that the soils at issue have "low permeability" is a 1948

pre-construction report of site conditions before the Lake Isabella Dam was constructed.

Kiewit's MJAR at 32 (citing Original Construction Doc. Part IV, Tab 33B at AR 14291).

According to the government and FDS, however, geotechnical data provided in the

Solicitation that post-date the 1948 report show the soil is permeable.  Def.'s MJAR at

41, n.26; FDS's Resp. at 16; *see generally* Geotechnical Lab Results, Tab 29(c)-(l);

Solicitation Attach. 05, Tab 37 at AR 17537.  The Corps' Agency Report before the GAO

also explained that the more recent materials confirm the soil is permeable.  Agency

Response to Prot.'s Comments & Supp. Protest Grounds, Tab 139 at AR 30858 (the

borings and lab test data included in the Geotechnical Data Report indicate that the

foundation of the Auxiliary Dam does *not* consist of low permeable soil).  In such

circumstances, Kiewit's understanding of the soils is not necessarily correct.

Accordingly, Kiewit has not shown that the Corps was not rational when it questioned

Kiewit's understanding of soil conditions.[7]

---

[7] Kiewit suggests that the Corps' judgment is irrational because it received a significant
strength for its dewatering plan which it states was based on its assumption that the soils had low

### 3.   The Corps' Decision to Give FDS's Dewatering Plan a Significant Strength Is Rational and Supported

Kiewit contends the Corps' decision to give FDS a significant strength under technical factor 1 for its dewatering plan was irrational.  Kiewit's MJAR at 27-29.  The court disagrees.  First, the court agrees with FDS that Kiewit's contention that FDS did not provide a dewatering plan is wrong.  FDS's Resp. at 16.  FDS did provide a plan. FDS Rev. Proposal, Tab 99 at AR 28766-69.  Second, the court finds that Kiewit's criticism of FDS's dewatering plan on the grounds that FDS did not consider 2011 groundwater data is not supported.  The Corps gave FDS a significant strength because FDS expressly stated that it would "utilize historical data, in addition to monitoring data collected throughout 2018 in preparation for [its] dewatering plan."  *Id.* at AR 28766; *see also* SSDD, Tab 109 at AR 30263-64.  Kiewit has not shown that the Corps' decision to assign FDS a significant strength for its dewatering plan was irrational.

### E.   Kiewit's Disparate Treatment Claim Is Not Supported

Kiewit argues that the Corps failed to treat Kiewit the same as FDS in its evaluation of technical factor 1.  Kiewit's MJAR at 32-53.  Kiewit claims it was not fairly evaluated on: (a) stockpiling location; (b) quality control ("QC") plan; (c) stockpile protection; (d) material processing; (e) haul roads and cofferdam; and (f) groundwater monitoring.  *Id.*  In considering Kiewit's objections, the court is mindful that it does not

---

permeability.  This contention does not establish that the Corps' statements regarding soils were in error.  The record indicates that the significant strength Kiewit received for its dewatering plan was based on its willingness to perform additional testing on "existing wells and piezometers to validate [its] dewatering plan" and not because it properly understood soil conditions.  *See, e.g.*, Rev. SSEB Rep., Tab 106 at AR 30145.

have the authority to re-evaluate proposals.  "[T]he court must be mindful that it may not

substitute its judgment for that of the agency, but rather must confine its review to

determining whether the agency's decision was arbitrary and capricious.  The court must

avoid 'undue judicial interference with the lawful discretion given to agencies.'"

*Eskridge Research Corp. v. United States*, 92 Fed. Cl. 88, 97 (2010) (quoting *Axiom Res.*

*Mgmt., v. United States,* 564 F.3d 1374, 1384 (Fed. Cir. 2009)) (other internal citations

omitted).  This need for mindfulness is especially true with regard to evaluations of an

offeror's technical approach.  *Atl. Diving Supply Inc. v. United States*, 107 Fed. Cl. 244,

250 (2012) ("'The evaluation of proposals for their technical excellence or quality is a

process that often requires the special expertise of procurement officials, and thus

reviewing courts give the greatest deference possible to these determinations.'") (internal

quotations omitted).  Given the expertise necessary to evaluate proposals, it appears to

the court that Kiewit's objections relate to the manner in which the Corps exercised its

judgment in evaluating the proposals and do not support a finding that the Corps engaged

in disparate treatment.

Kiewit objects to the Corps' evaluation of the stockpiling location.  Kiewit's

MJAR at 33-37.  Kiewit argues it designated a stockpiling location but did not receive the

same credit as FDS.  *Id.*  The court has looked at the proposals and it is clear from a

review of the proposals that FDS identified the location of its stockpile in a more specific

and detailed manner than Kiewit.  Kiewit designated its Zone 4B stockpile area within

another larger area identified as "waste" without any detail as to the specific location,

whereas FDS provided a more specific and detailed identification of the location of its

Zone 4B stockpile. *Compare* Kiewit Rev. Proposal, Tab 98 at AR 28268 *with* FDS Rev. Proposal, Tab 99 at AR 28750. FDS also addressed the Corps' concerns regarding the potential risk of the stockpile becoming too large by "scal[ing] down production in the excavation to match [the] processing needs." *See* FDS Rev. Proposal, Tab 99 at AR 28755-56. Kiewit apparently did not do so. Rather, Kiewit merely alleged that the material would fit without providing a specific location and made no mention of potential efforts to mitigate risks. Kiewit Rev. Proposal, Tab 98 at AR 28268. In such circumstances, Kiewit has failed to show that the difference in ratings was not based on the application of the Corps' technical judgment but on disparate treatment.

The court finds the same is true with regard to the QC plans. FDS provided additional QC in material placement by offering disking and by having FDS personnel working on the embankment who could check the grade using GPS equipment. FDS Rev. Proposal, Tab 99 at AR 28765. Further, FDS identified numerous techniques it will use for QC purposes, such as separating the various crushing stages to "allow[] the excavation operations and production at the primary crushing to be completely independent of the secondary and tertiary crushings . . . [to] provide[] more flexibility and reliability to the plant and independence of all operations, thereby reducing associated schedule risk." *Id*. at AR 28763. FDS is also planning to transport finished material using "a belt conveyor to a two-deck vibrating screen. The opening of the meshes in this screen will be adjusted depending on the final products to be produced." *Id.* FDS will also design the processing plant "to be highly flexible, giving [FDS the] opportunity to change the final materials and proportions being produced, based on

scheduled embankment needs" and will include "a water network with water bars at required locations to avoid dust generation, in addition to the network for aggregate washing," thereby helping to "minimize the need for additional water, including a clarifier and decantation ponds." *Id.* This additional QC was the basis of the evaluation strength. *See* SSDD, Tab 109 at AR 30263-64; Rev. SSEB Rep., Tab 106 at AR 30149. The difference in ratings is therefore supported by facts in the record. The court has no basis for second-guessing the Corps' technical conclusion.

Next, the Corps compared FDS's proposal with Kiewit's proposal regarding the protection of stockpiles. The Corps found that FDS's proposal was technically superior. SSDD, Tab 109 at AR 30263. FDS's proposal was more detailed than that of Kiewit and included a discussion of risk mitigation that involved drop height from conveyors and the use of clean trucks. *Compare* FDS Rev. Proposal, Tab 99 at AR 28764 *with* Kiewit Rev. Proposal, Tab 98 at AR 28284. The court does not have a basis for questioning the Corps' finding on the basis of its judgment that FDS's proposal was superior.

Regarding Kiewit's final contention that it addressed the same issues regarding the protection of stockpiles, as addressed by FDS in its proposal, elsewhere in its proposal, the court agrees with FDS that the Corps was not obligated to look for that information elsewhere in the proposal. FDS's Resp. at 23. The Solicitation stated that "the Government is not obligated to search for or to consider information that is not located in the specified location." Solicitation, Tab 23 at AR 1463 (¶ 3.3). If Kiewit failed to put the information in the correct place, it cannot blame the Corps if the information was not found. A review of FDS's proposal confirms that it provided a highly detailed proposal

34

with regard to material processing.  *See* FDS Rev. Proposal, Tab 99 at AR 28761-63.

The record shows that this same level of detail was not provided by Kiewit.  The

Solicitation called for "detailed technical narrative" that must be "comprehensive,"

urging offerors to "elaborate on other features of the work that [were] considered relevant

or where a high degree of risk [was] involved that may adversely affect the planned

performance period."  Solicitation, Tab 23 at AR 1465.  Consistent with this, the Corps

expressly provided that "[t]he more detailed, logical, realistic or achievable the technical

approach the more favorable the rating."  *Id.* at AR 1471.  The court will not second-

guess the Corps' technical judgment.

The court also finds that the difference in FDS's and Kiewit's level of detail with

regard to hauling supports their different ratings.  *Compare* FDS Rev. Proposal, Tab 99 at

AR 28750, 28753, 28755 *with* Kiewit Rev. Proposal, Tab 98 at AR 28268.  Specifically,

the difference in Kiewit's and FDS's level of detail is identified with figures and

descriptions.  *Id.*  (*See, e.g.*, FDS Rev. Proposal, Tab 99 at AR 28753 ("sacrificial fills

will create improved access to the work areas, better haul roads, and an additional staging

area for the concrete weir work.  These strategic fills placed in this location will also

serve as an additional protective berm for the weir and spillway work in case of

unexpected high water.")).  The court simply has no basis for questioning the Corps'

decision to assign two strengths to FDS's proposal for a cofferdam and haul roads and to

not assign Kiewit the same strengths.

Finally, the court finds that the Corps' decision to give FDS a strength for its

groundwater monitoring, citing specifically to page 21 of FDS's proposal for including

monitoring to verify the fulfillment of environmental requirements, was rational.  *See* Rev. SSEB Rep., Tab 106 at AR 30150 (Strength 10); FDS Rev. Proposal, Tab 99 at AR 28768.  The Corps also noted that FDS's groundwater monitoring will "assist in [the] development of [FDS's] dewatering plan."  Rev. SSEB Rep., Tab 106 at AR 30150; FDS Rev. Proposal, Tab 99 at AR 28766-67.  The court finds that because FDS's plan was more detailed and provided other benefits that were not provided by Kiewit in its proposal,[8] the difference in ratings was based on technical judgments and was not irrational.

### F.    The Corps Properly Evaluated Kiewit Under Technical Factor 3

Kiewit asserts that the Corps' decision under technical factor 3 (Experience and Capability) to assign FDS a significant strength for dewatering experience, while it assigned Kiewit only a strength for dewatering experience, was irrational and not supported.  Kiewit's MJAR at 53-56.  The evaluation criteria for technical factor 3 provided that an offeror would be evaluated more favorably for submitting prior projects that are similar to the Lake Isabella Dam project.  Solicitation, Tab 23 at AR 1471 (¶ 5.3). The SSAC's evaluation explained that Kiewit received a strength because one of its prior projects used a dewatering system similar to that proposed by Kiewit.  Rev. SSAC Rep., Tab 107 at 30233.  FDS, however, received a significant strength for its dewatering experience because FDS "included four projects that had foundation dewatering requirements on embankment dams with partial pool reservoirs."  *Id.* at AR 30233-34.

---

[8] *See* Kiewit Rev. Proposal, Tab 98 at AR 28295.

36

This explanation supports the difference in the evaluations.  The Corps determined that FDS's more extensive experience with dewatering in the same conditions as those at Lake Isabella Dam was more of an advantage to the agency than Kiewit's single experience with a similar dewatering method in dissimilar conditions.  The Corps' conclusion was well within its discretion and will not be second-guessed.

### G.    The Corps Properly Evaluated FDS Under Technical Factors 3 and 5

Kiewit challenges the Corps' evaluation of FDS under technical factors 3 (Experience and Capability) and 5 (Past Performance).  Kiewit's MJAR at 56-60.  Kiewit asserts that it is *per se* unreasonable or irrational for the Corps to evaluate FDS as "Outstanding" under technical factor 3 but to have only given FDS a "Satisfactory Confidence" rating, the second highest rating, under technical factor 5.  The court disagrees.

Technical factor 3 of the Solicitation provided that each offeror must submit at least three, but no more than six, prior projects for evaluation.  Solicitation, Tab 23 at AR 1468 (¶ 4.3).  At least one project was required to include work on a zoned embankment dam (at least 50 feet high) and at least one project was required to include work on a spillway (at least 5,000 cubic yards).  *Id.*  For technical factor 5, the Solicitation provided that each offeror was required to submit past performance information for the prior projects submitted under technical factor 3.  *Id.* at AR 1469 (¶ 4.5).  These projects would be evaluated based on their relevancy, including whether the project had a similar "dollar value, contract type . . . subcontract/teaming" arrangement, etc. *Id.* at AR 1471-2 (¶5.5).  Although FDS's proposal was rated "Outstanding" for technical factor 3, it received a

"Satisfactory Confidence" rating for technical factor 5.  SSDD, Tab 109 at AR 30268.

This does not however render FDS's "Outstanding" rating for technical factor 3 arbitrary.

Rather, FDS received the lower rating for technical factor 5 because it only submitted

past performance information for five of the six projects submitted under technical factor

3.  *Id.*  FDS was downgraded because of its omission.  The Corps' decision on technical

factor 5 was supported on the basis of the evaluation criteria for technical factor 5.  The

rating on technical factor 5 did not, however, make the Corps' conclusions regarding

technical factor 3 irrational as discussed below.

      Kiewit argues that the Corps' evaluation of FDS's proposal as "Outstanding"

under technical factor 3 and as "Satisfactory Confidence" under technical factor 5 is

arbitrary and capricious because the ratings are "inconsistent."  Kiewit's MJAR at 58.

The court disagrees.  As the GAO stated when it denied Kiewit's protest, "Kiewit seems

to simply ignore the fact that the experience and capability factor and past performance

factor were evaluated under different criteria . . . Our review of the record confirms the

reasonableness of the agency's evaluation in this regard."  *Kiewit Infrastructure* at 7, Tab

142 at AR 30946.  The court agrees with the GAO.  There is no inconsistency between

the Corps' evaluation of FDS under technical factors 3 and 5 regarding FDS's experience

and past performance.  Past performance was downgraded to address FDS's omission in

not submitting a sixth project, not because the Corps questioned FDS's past performance.

The court finds that the difference in ratings for technical factors 3 and 5 are adequately

explained and that there is no irrational inconsistency between the Corps' evaluation of

FDS under technical factors 3 and 5.

**CONCLUSION**

For all of the above-stated reasons, Kiewit's Motion for Judgment on the Administrative Record is **DENIED** and the government's and FDS's Motions for Judgment on the Administrative Record are **GRANTED**.[9]  The Clerk is directed to enter judgment accordingly.  No costs.

      **IT IS SO ORDERED**.

s/Nancy B. Firestone
NANCY B. FIRESTONE
Senior Judge

---

[9] The court finds that all of Kiewit's other objections to the procurement decision are without merit and having determined that Kiewit has not succeeded on the merits of its motion, the court has no occasion to rule on its request for injunctive relief.